# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80886-CIV-ROSENBAUM
(Consent case)

TERESA M. MORRISON,

     Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

_____/

## ORDER

## *I.  INTRODUCTION*

     This matter is before the Court on cross-motions for summary judgment filed, respectively, by Plaintiff Teresa Morrison ("Claimant") and by Defendant Michael Astrue, Commissioner of Social Security ("Commissioner").  The parties consented to jurisdiction before me and the case was then referred to me by the Honorable William P. Dimitrouleas for all further proceedings and the entry of a judgment.  I have reviewed the cross-motions for summary judgment, and Plaintiff's response in opposition, as well as the record in this matter.  This matter is now ripe for disposition.

     This is an action seeking review of the final decision of the Commissioner denying Claimant's application for Disability Insurance Benefits under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381, *et seq.*   The cross-motions for summary judgment present the following issue: whether substantial evidence exists to support the determination by the Administrative Law Judge ("ALJ") that Claimant is not disabled under the Social Security Act and retains the residual functional capacity to perform sedentary work and, therefore, to return to her past

relevant work as a parking lot cashier or receptionist.  Under the limited standard of review that governs this case, this Court concludes that the ALJ failed to address the medical opinions of a treating physician whose conclusions were inconsistent with the ALJ's findings.  Accordingly, the Court grants, in part, Plaintiff's Motion for Summary Judgment [D.E. 20], denies Defendant's Motion for Summary Judgment [D.E. 24], and remands the Commissioner's decision to the Administrative Law Judge for findings consistent with this opinion.

## II.   PROCEDURAL HISTORY

Claimant filed an application for Supplemental Security Income ("SSI") benefits on August 11, 2005, under Title XVI of the Act.  (Tr. 59-65).  Claimant allegedly became disabled beginning on June 27, 2005, due to, as stated in her Disability Report, "back problems."  (Tr. 59, 144).  The Social Security Administration ("SSA" or "Administration") denied the application initially on February 21, 2006, and upon reconsideration on September 24, 2007.  (Tr. 52-55, 46-49).

Thereafter, Claimant requested a hearing, which was granted and subsequently held on September 24, 2007.  (Tr. 23).  Claimant was present with counsel at the hearing in West Palm Beach, Florida, and Administrative Law Judge Wendy Hunn presided over the hearing via video-conferencing from Ft. Lauderdale, Florida.  (Tr. 14).  On November 9, 2007, the ALJ issued a decision and found that Claimant retained the ability to perform sedentary work, including her past relevant work as a parking lot cashier or as a receptionist.  (Tr.17, 21).  Accordingly, the ALJ found that "the claimant has not been under a disability within the meaning of the Social Security Act since August 11, 2005, the date the application was filed."  (Tr. 14-22).

Claimant later requested review of the unfavorable ALJ decision by the Appeals Council. On June 8, 2008, the Council denied Claimant's request for review. (Tr. 4-6). Accordingly, the decision of the ALJ stands as the final decision of the Commissioner. (Tr. 4).

On August 8, 2008, Claimant filed this Complaint [D.E. 1] seeking reversal of the Commissioner's final decision. On November 26, 2008, the Commissioner filed an Answer [D.E. 9] to the Complaint. After the Court issued an Order Setting Briefing Schedule, Claimant filed her Motion for Summary Judgment [D.E. 20], the Commissioner filed his Motion for Summary Judgment [D.E. 24], and Claimant filed her Reply [D.E. 26] to Defendant's Motion. The parties also appeared before me at a hearing held on July 16, 2009.

### III.   FACTS

**A.   <u>General Background</u>**

Claimant, who was born on February 9, 1968, and was 37 years old at the time of the onset of her claimed disability, is not currently working. (Tr. 31, 305). She has past relevant work experience, however, as a non-emergency transport driver as well as experience as a cashier in a parking garage and as a receptionist/customer service representative. (Tr. 305-309). As a result of what Claimant describes as severe and chronic back pain, Claimant asserts that she has not been able to work since June 27, 2005. (Tr. 59, 144-145). According to Claimant, she became disabled due to an on-the- job accident while driving a non-emergency transport vehicle. (Tr. 59, 305-306). Claimant contends that her back pain became worse when she was involved in a subsequent accident on March 4, 2007. (Tr. 18, 306). More specifically, she alleges that she suffers from lower back and neck pain, as well as degenerative disc disease ("DDD") and depression. (Tr. 16, 144, 257).

3

Claimant contends that the resulting pain prevents her from bending, sitting, standing, or walking for any reasonable length of time.  (Tr. 242, 316-318).

**B.**    **Medical Evidence/Treating Physicians**

Claimant has been treated and evaluated by various doctors.  Thus, for simplification of the evidence relating to Claimant's medical condition, Claimant's physicians' findings will be set forth below, primarily in chronological order.

**1.**    **Initial Hospital Visits**

On June 28, 2005, Claimant presented to the emergency room of St. Mary's Medical Center with chief complaints of abdominal pain, pelvic pain, and vomiting.  (Tr. 286).  Specifically, Claimant reported mild pain and tenderness in her lower abdominal area.  (Tr. 286-287).  Upon examination, the hospital observed that Claimant was not in acute distress and her neck and back were found to be normal.  (Tr. 287).  Her extremities were non-tender, she had a normal range of motion, and her mood and affect were normal.  (Tr. 287).  The treatment provider noted that Claimant did not suffer from any motor or sensory deficit (Tr. 287) and indicated "no impairment" regarding her sensory perception.  (Tr. 289).  No limitations were noted with respect to Claimant's mobility, and her activity while at the hospital involved walking "frequently."  (Tr. 289).  The treatment provider's clinical impression included abdominal pain, a urinary tract infection, and pelvic inflammatory disease.  (Tr. 287).

On July 11, 2005, Claimant visited South Florida Medical Center ("SFMC") with complaints of lower back pain.  (Tr. 232).  During a later visit for lower back pain on August 8, 2005, a treatment provider at SFMC prescribed Claimant Ibuprofen, Flexeril,[1] and Vicodin.[2]  (Tr. 231).

On October 14, 2005, Claimant returned to SFMC and was prescribed Prozac.[3]  (Tr. 230). Claimant continued treatment for her back pain at SFMC through May of 2006.  (Tr. 224-230).  Due to Claimant's complaints of back pain with radiation and weakness, she was referred to physical therapy during that time.  (Tr. 235-236).  When Claimant was evaluated on March 14, 2006,  the physical therapist indicated that Claimant's symptoms were "probably from working [her] last job," which involved driving a non-emergency transport vehicle and elevating wheelchair-bound passengers using a lift. (Tr. 235, 305-306).  The therapist also identified a prior back injury that happened as a consequence of a slip and fall that occurred approximately six to seven years prior. (Tr. 235).  Claimant's rehabilitation potential was reported as being good to fair, and a wide range of treatment was prescribed to improve certain functional limitations that Claimant reportedly experienced.  (Tr. 236).

---

[1]   Flexeril is a muscle relaxant.  It works by blocking pain sensations that are sent to the brain.  *See* http://www.drugs.com/flexeril.html.

[2]   Vicodin is a medication containing a combination of acetaminophen and hydrocodone.  It is used to relieve moderate to severe pain.  *See* http://www.drugs.com/vicodin/html.

[3]   Prozac is an antidepressant drug that affects chemicals in the brain that may become unbalanced and cause depression, panic, anxiety, or obsessive-compulsive symptoms.  *See* http://www.drugs.com/prozac/html.

2.      **Dr. Timothy Toward**

Records reflect that Claimant was seen by Dr. Timothy R. Toward for treatment on August 8, 2005.  (Tr. 189, 190, 192, 265).  The transcript contains three different medical verification forms completed by Dr. Toward with respect to Claimant's lower back condition.  (Tr. 189, 190, 192, 265).[4]  Indeed, Dr. Toward prepared two identical forms on September 14, 2005 (Tr. 192, 265), another on August 12, 2005, and a third on December 19, 2005.  (Tr. 186, 189, 190).  While all three evaluations diagnose Claimant with lumbar disc disease, other information provided in the forms appears to be internally inconsistent.[5]  The two forms dated August 12, 2005, both indicate that Claimant's back condition permitted her to work with restrictions, that a treatment plan had been prescribed, and that she was engaging in ongoing therapy and treatment.  (Tr. 189, 190).  However, while one of these forms (Tr. 189) indicates that Claimant can participate in activities for between 1 and 10 hours per week, the other form with the same date (Tr. 190) opines that she is unable to work (despite indicating on the same form that Claimant can participate in some activity).  Additionally, while one of the forms (Tr. 190) indicates that Claimant's condition is permanent, it is unclear whether the other form (Tr. 189) reports a similar finding.

---

[4]      It appears that Dr. Toward prepared two of the same medical verification forms on August 12, 2005, as both reference Claimant's most recent office visit as August 8, 2005. (Tr. 189-190).  Likewise, forms dated September 14, 2005, appear to be identical copies of the same form.  (Tr. 192, 265).  This form also references Claimant's most recent office visit as August 8, 2005.

[5]      Although the form completed on September 14, 2005, is legible (Tr. 192, 265), the comments, and in some cases the checked boxes, on the two forms completed on August 12, 2005 (Tr. 189, 190), are virtually illegible.  The Court notes that Dr. Toward did make certain limited comments on the forms completed on August 12, 2005.  However, the Court cannot speculate as to the substance or content of those comments for the purposes of making factual findings regarding Claimant's condition or recommended course of treatment.

6

Furthermore, Dr. Toward's notes on each of the forms dated August 12th (Tr. 189, 190) are difficult to understand in light of the medical verification form that he completed on September 14, 2005. (Tr. 92, 265). In the September 14th form, Claimant's most recent office visit was noted as being on August 8, 2005 – the same visitation date referenced in the previous two forms. (Tr. 192, 265). While Dr. Toward's diagnosis of lumbar disc disease remained the same, other significant evaluations changed. Whereas Dr. Toward previously found that Claimant's condition permitted work with restrictions (Tr. 189, 190), his opinion changed to indicate that Claimant was unable to work. (Tr. 192, 265). Further, while he had previously opined that Claimant's condition permitted her to participate in other activities, Dr. Toward changed his opinion and indicated that Claimant's condition did not allow her to participate in other activities. (Tr. 190, 192, 265). Finally, on the form dated September 14, 2005, Dr. Toward indicated that home therapy and medication were required as treatment for Claimant's condition, but he did not note the required frequency of such treatment. (Tr. 192, 265).

Dr. Toward subsequently filled out a final medical verification based on Claimant's office visit on December 19, 2005. (Tr. 186). As noted on the form, Dr. Toward's opinions remained consistent with those expressed on the September 14, 2005, verification form. (Tr. 192, 265). Dr. Toward indicated once again that Claimant suffered from lumbar disc disease and opined that this condition did not allow her to work, even with restrictions. (Tr. 186). Dr. Toward also found that Claimant's condition did not permit participation in other activities, and that Claimant was taking medications that prevented her from engaging in work activities. (Tr. 186). Dr. Toward continued to opine that Claimant's condition was permanent and that a treatment plan had been prescribed,

including physical therapy.  (Tr. 186).  Again, Dr. Toward declined to indicate the frequency with which therapy was recommended or required.

### 3.    Donna Ducille, D.O.

On April 25, 2006, Claimant began treatment with Dr. Donna Ducille. (Tr. 224).  During her initial consultation, Claimant indicated that she suffered from a herniated disc, chronic back pain, and depression.  (Tr. 224).[6]  Dr. Ducille diagnosed Claimant with chronic back pain and a herniated disc, and recommended a neurosurgery referral.  *Id.*  When Claimant returned for an office visit on May 23, 2006, Dr. Ducille filled out a form indicating that Claimant's condition did not permit work, even with restrictions.  (Tr. 191).  However, Dr. Ducille indicated that Claimant's condition was temporary and was expected to end in August of 2006.  *Id.*  Claimant returned to see Dr. Ducille on August 10, 2006, at which time Dr. Ducille continued to opine that Claimant was unable to work and could not participate in other activities.  (Tr. 188).  At this time, Dr. Ducille reaffirmed her previous finding that Claimant's condition was temporary, but now gave a new estimated end date of November of 2006.  *Id.*

Dr. Ducille subsequently filled out two more forms regarding Claimant in October of 2006 and March of 2007.  (Tr. 187, 193).[7]  On both of these forms, however, the only discernable information is that the Claimant was unable to engage in any of the tasks listed under "Activities."

---

[6]    The Court notes that Dr. Ducille made notations with respect to a treatment plan, health instructions, and preventive care.  However, because those comments are illegible, the Court cannot make any factual findings as to those recommendations.

[7]    The date of Claimant's office visit on each of these forms is illegible.  Additionally, while the name of the licensed physician is also illegible on both of these forms, the signature on them appears to be the same as those on the forms where Dr. Ducille was listed as the licensed physician.

8

(Tr. 187, 193).  On the October, 2006 form, Dr. Ducille did not indicate whether Claimant's condition remained temporary or had become permanent and further failed to note whether Claimant was capable of working.  (Tr. 187).  Similarly, on the March, 2007 form, Dr. Ducille did not indicate whether Claimant's condition was temporary or permanent, and it is unclear whether she rendered an opinion as to whether Claimant was capable of working.  (Tr. 193).

    **4.    Jamal Halim, M.D.**

On June 21, 2006, upon the referral of Dr. Ducille, Claimant presented to Dr. Jamal Halim for a neurological evaluation.  (Tr. 165-166, 218-219).  During the examination, Claimant reported a one-year history of lower back pain, which she described as persistent and radiating down the right lower extremity to her foot.  (Tr. 165, 218). Claimant further indicated that she had been taking Percocet, Flexeril, and Motrin with only limited improvement.  *Id.*  Dr. Halim reviewed an MRI of Claimant's lumbosacral spine which was performed in December of 2005, and noted that the scan showed evidence of posterolateral disc herniation at L4-5 and L5/S-1 to the left side with foraminal stenosis.  *Id.*

Upon examination, Dr.Halim found that Claimant was awake, alert, and oriented to time, place, and person.  (Tr. 166, 219).  Her speech was fluent, her language and comprehension were normal, and her short- and long-term memories were intact.  *Id.*  Claimant experienced mild weakness involving right-foot dorsiflexion and eversion, and there was mild decreased sensation in the right L-5/S-1 distribution.  *Id.*  With respect to gait, Dr. Halim found that Claimant limped on her right lower extremity, but was able to walk without the use of a cane.  *Id.*  The doctor concluded

that Claimant had disc herniation at L4-5 and L-5/S-1 and scheduled a nerve conduction study to rule out bilateral lumbar radiculopathy.[8]  *Id.*

On August 17, 2006, Claimant revisited Dr. Halim for the nerve conduction study, which showed evidence of sensory neuropathy, but did not reveal any evidence of lumbar radiculopathy. (Tr. 161).  Dr. Halim noted that Claimant's symptoms were progressive and were not showing any improvement in her lower back, despite pain management.  *Id.*  Accordingly, he recommended that Claimant undergo a neurosurgical evaluation and gave her a prescription for Percocet.[9] (Tr. 161).

On October 17, 2006, Claimant returned to Dr. Halim after undergoing a neurosurgical evaluation performed by Dr. Brodner.  (Tr. 160).  During her visit, Claimant informed Dr. Halim that Dr. Brodner was not inclined to operate on her.  *Id.*  Instead, Claimant indicated that Dr. Brodner advised her to lose weight and continue with her conservative treatment including referral to pain management.  *Id.*  Claimant advised that she wanted a second opinion.  *Id.*  In response, Dr. Halim provided Claimant with a prescription for her current medications and told her to seek a second neurosurgical evaluation.  *Id.*

During Claimant's visit with Dr. Halim on March 21, 2007, Claimant advised that she had obtained a second surgical evaluation performed by Dr. Nair.  (Tr. 159).  Dr. Nair did not recommend any surgical intervention concerning Claimant's lumbar disc disease.  *Id.*  Claimant reported that she still had "a lot" of low back pain, and had been to pain management in the past,

---

[8]    Radiculopathy is not a specific condition, but rather a description of a problem in which one or more nerves are affected and do not work properly.  *See* http://en.wikipedia.org/wiki/radiculopathy.

[9]    Percocet is a medication used for relieving moderate to moderately severe pain.  It is a combination of a narcotic and an analgesic.  *See* http://.www.drugs.com/cdi/percocet.html.

which did not help. *Id.* At this time, Claimant was still taking Percocet, Flexeril, and Motrin for pain. *Id.* Dr. Halim recommended that Claimant lose weight to improve her lower back pain. *Id.* He also informed Claimant that she was not a surgical candidate and that her pain had to be controlled with conservative treatments including medication. *Id.* Claimant, however, expressed to Dr. Halim that she was not interested in physical therapy or pain management. *Id.*

Claimant returned to see Dr. Halim on July 12, 2007, at which time she reported that she had been involved in a motor vehicle accident on March 4, 2007. (Tr. 158). Claimant indicated that she was a passenger in a car with her seatbelt on when the car that she was traveling in rear-ended the car in front of her, which was stopped at a traffic light. *Id.* Although Claimant did not go to the hospital, she saw a chiropractor (Dr. Osler) the next day who ordered an MRI of her cervical spine. *Id.* Dr. Halim reviewed the MRI and noted evidence of a herniated disc at C5-6 with spinal stenosis.[10] *Id.* During her visit with Dr. Halim, Claimant complained of non-radiating neck stiffness and stated that she continued to take her Percocet. *Id.* Dr. Halim advised her to proceed with a pain management evaluation and to obtain epidural injections in the lumbar spine and cervical spine. *Id.*

**5.    Bruce Osler, D.C.**

Although the record does not contain copies of Claimant's treatment notes, the record does reflect that Claimant first saw chiropractor Bruce Osler on March 5, 2007, after she was involved in her March 4, 2007, accident. (Tr. 167). A final narrative report drafted by Dr. Osler on July 18, 2007, indicates that, upon suggestion of her counsel, Claimant presented to Dr. Osler for an impairment evaluation and examination. (Tr. 167-170). The report reveals that when Claimant saw

---

[10]    Spinal stenosis is a medical condition in which the spinal canal narrows and compresses the spinal cord and nerves. *See* http://en.wikipedia.org/wiki/spinal_stenosis.

Dr. Osler initially, she reported headaches, mid-back pain, and neck pain extending down into her right hand. (Tr. 167).

Upon examination on July 18, 2007, Dr. Osler found that the muscles of Claimant's cervical spine and upper extremities were of equal strength bilaterally. (Tr. 168). He also found, however, a limitation existed in the range of motion in Claimant's cervical spine in all planes of motion. *Id.* Claimant indicated pain during cervical extension and left lateral flexion. *Id.* Based upon a review of Claimant's x-rays and MRI, Dr. Osler found a cervical disc herniation at the C5-6 level with spinal stenosis and cord encroachment, as well as a bulging disc at the C4-5 and C6-7 levels. (Tr. 168-169). Dr. Osler's impressions were that Claimant had cervical radiculitis, post-traumatic cervical and thoracic sprain/strain, and post-traumatic headache syndrome. (Tr. 169). Based on these impressions, Dr. Osler opined that Claimant had reached maximum medical improvement with a seven percent impairment of the total person. *Id.*[11] He concluded that she would require four weeks of therapy per year and that Claimant's "pain does interfere with her normal activities of daily living." (Tr. 170).

**6.    Jeffrey Kugler, M.D.**

On May 30, 2007, Claimant presented to Dr. Jeffrey Kugler for treatment of injuries Claimant sustained in a motor vehicle accident on March 4, 2007. (Tr. 178). Claimant complained of neck pain, stating that she had been experiencing increased stiffness associated with a sharp pain radiating to her upper extremities. *Id.* Claimant also reported intermittent numbness and tingling in her

---

[11]    Dr. Osler indicated that he reached this conclusion pursuant to the *American Medical Association Guides to Evaluation of Permanent Impairment, Fifth Edition.* (Tr, 169). He obtained the seven percent impairment figure based on a DRE cervical Category II of five percent, a DRE thoracic Category II of one percent, and an additional one percent for chronic and persistent headaches. (Tr. 169).

hands.  *Id.*  She indicated that she had visited Dr. Bruce Osler for chiropractic treatment with

"moderate benefit."  *Id.*[12]  Claimant also noted that she was still taking Flexeril, Ibuprofen, and

Prozac.  *Id.*  Upon physical examination, Claimant displayed "mild tenderness to palpation" of the

cervical spine.  *Id.*  Dr. Kugler found Claimant to be neurologically intact, with no significant

instability, and with a "4+/5 motor function."  *Id.*  Although Dr. Kugler reported that there was mild

spasm, he found Claimant's reflexes to be equal bilaterally.  *Id.*  Based on an MRI of the cervical

spine from May 8, 2007, Dr. Kugler observed "C5-C6 dis[c] herniation with spinal stenosis and cord

encroachment, C4-C5 dis[c] bulge, and C4-C5 dis[c] bulge."  (Tr. 179).  Dr. Kugler's impression

was cervicalgia with radiculopathy for which he recommended physical therapy.  *Id.*

Approximately two weeks later, on June 18, 2007, Claimant saw Dr. Kugler for a follow-up

visit, during which Dr. Kugler reported similar physical examination findings.  (Tr. 175).  Dr. Kugler

recommended an orthopedic evaluation and prescribed Medrol Dosepak[13] as well as Flexeril.  *Id.*

He  further noted that Claimant had not received any epidural steroid injections, but stated that if

Claimant continued to have persistent complaints of pain, she would be considered a candidate for

epidural injections.  *Id.*

Claimant followed up with Dr. Kugler on July 9, 2007, during which visit she reported

continued radicular symptoms in her neck.  (Tr. 173-174).  Dr. Kugler noted findings similar to those

---

[12]    Claimant initially consulted with Dr. Osler on March 5, 2007, with symptoms of
headaches, mid-back pain, and neck pain with pain extending down into the right hand.  (Tr.
167).  She stated that those symptoms were a direct result of the motor vehicle accident she was
involved in on March 4, 2007.  (Tr. 167).

[13]    Medrol Dosepak is a steroid and prevents the release of substances in the body that
cause inflammation.  *See* http://www.drugs.com/mtm/medrol-dosepak.html.

made in May, 2007, and prescribed Claimant both Darvocet[14] and Soma.[15]  *Id.*  He referred Claimant

for an epidural injection, and Claimant stated that she wished to receive a cervical epidural steroid

injection as soon as possible.  *Id.*

On August 6, 2007, Claimant returned to Dr. Kugler, complaining of continuous neck pain

radiating to the scapular areas, but denying any numbness, tingling, or paresthesias.  (Tr. 171).

Although she reported some improvement with her neck pain, Claimant also stated that she

experienced occasional exacerbation as well.  *Id.*  Dr. Kugler noted that while he recommended a

pain management evaluation to consider epidural injections, Claimant had elected not to proceed and

instead, preferred to continue with conservative treatment.  *Id.*  Upon examination, Dr. Kugler made

physical findings similar to those made in May, 2007.  *Id.*  He further indicated that Claimant was

"doing better" and that if her symptoms persisted, she should proceed with epidural injections.  *Id.*

### 7. Steven Burack, D.O.

On June 26, 2007, upon a referral from Dr. Osler, Claimant presented to Dr. Steven Burack

for a physiatric consultation related to her March, 2007, car accident.  (Tr. 181).  Dr. Burack noted

that Claimant had "improving mild" and persistent back pain without radiation.  *Id.*  Claimant was

taking Ibuprofen, Flexeril, Prozac, and Percocet at the time.  *Id.*  Upon examination, Dr. Burack

found muscle spasm and hypertonicity involving the paraspinals and cervicoscapular muscle groups.

(Tr. 182).  Claimant had a normal gait pattern, was alert and oriented, had normal sensation, and

revealed no focal motor deficits.  *Id.*  Dr. Burack's diagnostic impression included cervical

---

[14]    Darvocet is a combination analgesic used to treat mild to moderate pain.  *See* http://www.drugs.com/cdi/darvocet,html.

[15]    Soma is a muscle relaxer that works by blocking pain sensations between the nerves and the brain.  *See* http://www.drugs.com/soma.html.

discopathy and cervical sprain/strain. *Id.* He opined that Claimant had reached maximum medical improvement with a four percent partial permanent impairment of the cervical spine. *Id.*

**C.**     **Consultative Examinations**

    **1.**     **Roger Bash, Ph.D.**

Claimant saw Dr. Roger L. Bash for a consultative psychological evaluation on October 19, 2005, pursuant to a referral by the Office of Disability Determinations. (Tr. 298-300). During the examination, Claimant indicated that she had applied for Social Security disability benefits based on an injury to a lumbar disc and due to feelings of stress, anger, and depression. (Tr. 298). Claimant stated that her depression began around the end of September, 2005, and that she had never felt emotional issues of this type in the past. (Tr. 299). Dr. Bash noted that Claimant was without posture or gait problems. (Tr. 298). Claimant reported her history of back injuries and stated that her nights were restless, but that her medications do help her with her mood by reducing her stress levels. (Tr. 298-299). Claimant, however, indicated that even while taking medications, she continued to have pain at the lower end of her spine and on the right side of her pelvis. (Tr. 299). Claimant also reported that she shouted at her children, became angry very quickly, and sometimes had suicidal thoughts. *Id.* She also said that at night she sometimes saw a person in a suit, but could not see his face. *Id.* Additionally, Claimant reported hearing voices telling her good and bad things. *Id.*

Dr. Bash conducted a mental status examination and found that Claimant was oriented in all spheres, was cooperative, and demonstrated good eye contact. *Id.* No problems were noted with her speech or language, but her affect was angry and tearful. *Id.* Claimant's recent and remote memory were below average, but her fund of information fell within functional limits. (Tr. 300). Her

abstract thinking and social judgment were also considered to be below average, and her insight into her condition was poor to fair. *Id.* Dr. Bash's diagnostic impression was that Claimant suffered from depressive disorder and pain disorder associated with both psychological factors and a general medical condition. *Id.* Dr. Bash concluded that Claimant was depressed and angry secondary to the effects of her injuries on her quality of life, and assigned her a GAF of 57.[16]

### 2. Alan Marcus, D.O.

Claimant saw Dr. Alan Marcus for a consultative evaluation on December 13, 2005, pursuant to a referral by the Office of Disability Determinations. (Tr. 194-195, 259-260, 262-263).[17] During the examination, Claimant complained of lower back pain and depression. *Id.* Dr. Marcus observed that Claimant was able to ambulate without assistance, but did so slowly. (Tr. 195). He further noted in his report that Claimant could not walk on her heels and toes. *Id.* Claimant's grip strength was normal, as were her fine motor movements, and her flexor strength in her left leg. *Id.* While Claimant's right leg was given a flexor strength of 3 out of 5, her gait did not require any assistance. *Id.* Straight leg rising on the right was positive at 30 degrees. *Id.* Examination of Claimant's spine revealed mild paravertebral muscle spasms in the lumbosacral spine and throughout the spine. *Id.*

---

[16]     Global Assessment Functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. A GAF score of 51 to 60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text rev.) ("DCM-IV-TR"), at 34.

[17]     It appears that transcript items 194, 259, and 262 are copies of the same report composed by Dr. Marcus on December 13, 2005. Despite the fact that the SSA apparently received each on a different date, the Court cannot discern any distinction between the reports, nor have the parties brought any such distinction to the Court's attention. Accordingly, the Court's reference to transcript items 194-195 shall incorporate reference to items 259-260 and 262-263.

Claimant displayed a reduced range of motion in her lumbosacral spine, but otherwise her range of motion was normal.  *Id.*  Claimant's major joints showed no evidence of deformity, pain, swelling, heat, redness, tenderness or any signs of inflammation except in the area of the left leg.  *Id.*

Dr. Marcus's impression was that Claimant suffered from low back pain with paravertebral muscle spasms in the lumbosacral spine area.  *Id.*  He suggested that Claimant follow up with an MRI of the lumbosacral spine to rule out any disc disease.  *Id.*  Dr. Marcus also recommended that Claimant use hot packs, ultrasound and electrical stimulation, and indicated that physical therapy modalities with gait strengthening would be helpful to increase Claimant's endurance.  *Id.*  He also noted that Claimant needed to participate in an extensive weight loss program, along with dietary counseling.  *Id.*  Dr. Marcus concluded that Claimant was depressed as a result of her condition and that a psychiatric follow-up would be appropriate.  *Id.*

On the same day that Claimant was evaluated by Dr. Marcus, she obtained a lumbar spine x-ray.  (Tr. 264, 266).  The x-rays revealed a "normal" lumbosacral spine.  (Tr. 264, 266).  There was evidence, however, of a possible urinary stone.  *Id.*  One week later, on December 20, 2005, Claimant obtained magnetic resonance imaging (MRI) of her spine at the request of Dr. Toward.  (Tr. 234).  The MRI revealed that Claimant had posterolateral herniated discs at L4-5 and L5-S1 to the left with foraminal encroachment.  (Tr. 233-234, 267-68).  Claimant was also found to have reactive changes in the facet joints at the L4 and L5 levels.  *Id.*

D.      **Non-Examining Physicians/Residual Functional Capacity Assessments**

        1.      **Physical RFCs**

A state medical consultant whose name is illegible reviewed Claimant's medical history and completed an RFC Assessment on January 29, 2006, in connection with Claimant's application for

Social Security benefits.  (Tr. 237-244).  Based upon the doctor's consideration of Claimant's medical history, the doctor concluded that Claimant could occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry 10 pounds.  (Tr. 238).  The doctor further determined that Claimant could stand and/or walk for approximately 6 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday.  *Id.*  Claimant's ability to push and pull, in the doctor's opinion, was unlimited, other than as shown for lifting and/or carrying.  *Id.*  The doctor cited specific facts in Claimant's medical records such as the results of an MRI performed, as well as other physical examinations to support these conclusions.  *Id.*  The doctor did note, however, that Claimant could not ambulate on her heels or toes and was obese.  (Tr. 239).

Dr. James Andriole, a medical consultant to the State Agency of Florida, reviewed Claimant's medical history and completed a Physical Residual Functional Capacity ("RFC") Assessment on September 12, 2006.  (Tr. 210-217).  Dr. Andiole diagnosed Claimant with obesity and back pain.  (Tr. 210).  Dr. Andriole, like the other medical consultant, also concluded that Claimant could occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry 10 pounds.  (Tr. 211).  Likewise, he opined that Claimant could stand and/or walk for approximately 6 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday.  *Id.*  Claimant's ability to push and pull, in Dr. Andriole's opinion, was unlimited.  *Id.*  Dr. Andiole also found that Claimant had no postural manipulative, visual, communicative, or environmental limitations.  (Tr. 212-215).  The RFC reflects that Dr. Andiole described Claimant to be only partially credible.  (Tr. 215).

### 2.       Psychological Evaluations

Dr. Susan Shapiro, a state medical consultant, reviewed Claimant's medical history and completed a Psychiatric Review Technique form on November 17, 2005, with regard to Claimant's application for disability benefits. (Tr. 245-258). Upon reviewing Claimant's medical history, Dr. Shapiro concluded that Claimant suffered from affective and somatoform disorders, which were not severe. (Tr. 245). With respect to Claimant's affective disorder, Dr. Shapiro opined that Claimant had depressive disorder, not otherwise specified. (Tr. 248). As for somatoform disorders, Dr. Shapiro determined that Claimant had pain disorder. (Tr. 251). Dr. Shaprio rated Claimant's functional limitation as "mild" with respect to restriction of daily activities, difficulty in maintaining social functioning, and difficulties in maintaining concentration, persistence, and pace. (Tr. 255). Overall, Dr. Shapiro diagnosed Claimant with depression and pain disorder, both not severe. (Tr. 257).

Another state medical consultant, Dr. Thomas Clark, also reviewed Claimant's medical history and completed a Psychiatric Review Technique form on September 13, 2006. (Tr. 196-209). Based on his consideration of Claimant's medical history, Dr. Clark, like Dr. Shapiro, found that Claimant displayed an affective disorder (*i.e.,* depressive disorder, not otherwise specified) and a somatoform disorder (*i.e.,* pain disorder). (Tr. 196). Dr. Clark likewise opined that Claimant suffered from only "mild" functional limitations with respect to her restriction on daily activities, her difficulty in maintaining social functioning, and difficulties in maintaining concentration, persistence, and pace. (Tr. 206). Dr. Clark's notes reflect that Claimant's symptoms of depression were mild, and Dr. Clark opined that Claimant's mental and emotional impairments were not severe. *Id.*

19

### E.   Claimant's Testimony Before the ALJ

On September 24, 2007, Claimant testified at an administrative hearing before ALJ Wendy Hunn.  (Tr. 301-339).  During the hearing, Claimant indicated that she was 39 years old and lived with her two children.  (Tr. 304-305).  Claimant testified that she first became disabled on June 27, 2005, when she was working as a non-emergency transport driver for the elderly.[18]  (Tr. 305).  As described by Claimant, her job entailed moving elderly people in wheelchairs onto the vehicle's lift and strapping them into seatbelts.  (Tr. 307).  The alleged disabling injury, which affected the lower lumbar portion of her back, occurred while Claimant performed her job.  (Tr. 306).  Claimant testified that she also sustained a neck injury as a result of a motor vehicle accident on March 4, 2007.  (Tr. 306).  She reported that she continues to experience lower back pain and numbness in her arm, as well as numbness and pain in both legs.  (Tr. 312, 314).  Claimant also indicated that at times, she feels like her neck problems are worse than those in her lower back.  (Tr. 318).  At the time of the hearing, Claimant was taking Percocet, Ibuprofen, Flexeril, and Prozac.  (Tr. 315).  She stated that the medications typically had the side effect of making her sleepy or drowsy.  (Tr. 315).

Although Claimant completed eleven years of education, she testified that she ultimately obtained her GED.  (Tr. 312).  Claimant is 5'5" tall and weighs approximately 230 pounds.  (Tr. 312).  According to Claimant, her typical day is spent lying in bed watching television and sleeping.

---

[18]   Prior to working as a non-emergency transport driver, Claimant was employed as a cashier at a parking garage.  (Tr. 309).  In this capacity she was required to take parking tickets from the patrons who were leaving the garage, and was capable of performing this job while sitting or standing.  (Tr. 309).  Claimant also previously worked as a "temp," doing clerical desk work such as customer service, data entry, answering phones, filing, and taking messages.  (Tr. 309-310).  Claimant's employment history also includes experience working as a certified nurse assistant, a receptionist/customer service representative, a cashier for Burger King, a packer, a deli clerk at Publix, and an inventory clerk.  (Tr. 331-332).

(Tr. 322).  On occasion she reads or helps her children with their homework. (Tr. 323, 325).  With respect to her back pain, Claimant testified that she can usually sit for approximately thirty minutes before she must get up or change positions in order to avoid severe pain on the left side.  (Tr. 314). She stated that she can stand for  about five to ten minutes before she must sit.  (Tr. 316).  Claimant also indicated that she can walk a block without having any difficulty, and that she is unable to lift anything heavier than five pounds.  (Tr. 322, 317).

The ALJ also heard testimony from Vocational Expert Jeannine Salek ("Salek" or the "VE") during the hearing.  (Tr. 330).  After Salek described each of Claimant's past relevant work positions, the ALJ proceeded to ask Salek a series of hypotheticals.  (Tr. 331-336).  In the first hypothetical, the ALJ asked Salek to assume an individual Claimant's age, with the same education and work experience, could perform the exertional demands of a limited range of light work (*i.e*, could lift and carry ten pounds frequently and ten pounds occasionally; sit or stand or walk six hours in an eight-hour day).  (Tr. 333).  The hypothetical claimant also needed to alternate between standing and sitting every 30 minutes and could occasionally perform postural activities.  *Id.*  When asked whether the hypothetical claimant could perform any of the instant Claimant's past relevant work, Salek responded that she could return to work as a cashier at Burger King, as a parking lot cashier, and as a receptionist or customer service representative.  (Tr. 333).[19]

In the second hypothetical posed to Salek, the ALJ asked her to assume an individual the same age, education, and work experience as the Claimant, but who was limited to lifting and

---

[19]    The VE indicated that with respect to the number of jobs that exist in the economy for cashiers, there are 15,000 in the state of Florida, and one million nation-wide.  With respect to receptionists, the VE testified that there are 30,000 positions in the state of Florida, and 1.3 million nation-wide.  Within the Tri-County area of Palm Beach, Broward, and Miami-Dade, the VE stated that there are 800 positions for cashiers and 850 positions for receptionists.  (Tr. 334).

carrying five pounds frequently and ten pounds occasionally.  The hypothetical claimant could also sit or stand and walk for up to six hours in an eight-hour day with a sit/stand option every thirty minutes and with postural limitations (*i.e.*, occasional bending and the other posturals only one-third of the time).  (Tr, 334-335).  Based on these assumptions, Salek testified that Claimant could still return to work as a receptionist and as a parking lot cashier.  (Tr. 335).

In the ALJ's third and final hypothetical, she asked Salek to assume that Claimant's testimony was fully credible regarding her functional limitations, namely, that she spends most of her day lying down.  (Tr. 335).  When asked whether she had an opinion as to whether Claimant could perform any of her past relevant work under these circumstances, Salek indicated that Claimant would not be able to return to any of her prior work.  (Tr. 335).  Salek further opined that under the circumstances of the third hypothetical, Claimant would not be able to perform any other job in the national economy because she would not be able to meet the requirements of sedentary work.  (Tr. 335).

Finally, when Claimant's counsel asked Salek on cross-examination whether the inability to concentrate on a specific job for more than thirty minutes would change the outcome of the ALJ's first or second hypotheticals, Salek indicated that this lack of concentration would affect the receptionist job, but would not affect an individual's ability to work as a parking lot cashier.  (Tr. 336).

## F.    **The ALJ's Decision**

The ALJ rendered her unfavorable decision on November 9, 2007.  (Tr.14-22).  After evaluating the entire record, the ALJ found that Claimant did not have a disability as defined under the Social Security Act and was not entitled to disability benefits.  *Id.*  Specifically, the ALJ

determined that Claimant suffered from lower back and neck pain, and degenerative disc disease with a herniated nucleus pulposus at L4-5, L5-S1, an impairment or combination of impairments considered "severe" based on the requirements set forth in 20 CFR § 404.1520(c). (Tr. 16). The ALJ also determined that Claimant suffered from affective disorder that was not severe. (Tr. 17). These impairments, however, did not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. *Id.* Based upon a review of the evidence, the ALJ found that Claimant has the residual functional capacity to perform sedentary work that provides a sit/stand option every thirty minutes, and is limited to occasional bending. *Id.* In making her determination, the ALJ concluded that while Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. (Tr. 19). Accordingly, the ALJ determined that Claimant was capable of performing her past relevant work as a parking lot cashier or receptionist, as this work would not require the performance of work-related activities precluded by Claimant's residual functional capacity. (Tr. 21).

### IV.   STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, this Court's role is a limited one. Indeed, judicial review of the Commissioner's findings of fact is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a

23

conclusion. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988). The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Bloodsworth*, 703 F.2d at 1239. If the ALJ's decision is supported by substantial evidence, the reviewing court must affirm the decision. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, the court must determine whether the ALJ properly applied the correct legal standards. *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

## *V.  ANALYSIS*

### A.    <u>The Sequential Evaluation</u>

Initially, a claimant has the burden of establishing that he or she is disabled under the Social Security Act. *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982); *Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10th Cir. 1991). A "disability" is defined as an inability . . .

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). In determining the merits of a claim for benefits, the court must consider the evidence as a whole, including: 1) objective medical facts or clinical findings; 2) diagnoses of examining physicians; 3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by other witnesses; and 4) the claimant's age, education, and work history. *Walden*, 672 F.2d at 839. Here, Claimant must establish that she was disabled on or prior to her date of last insured.

*Step One.* To arrive at a determination as to disability, the ALJ must undertake the five-step sequential evaluation embodied in 20 C.F.R. § 404.1520. This process requires that the ALJ first determine whether the claimant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If so, a finding of "no disability" is made. If the claimant is not engaged in such activity, then the ALJ must proceed to the second step of the sequential evaluation.

As a threshold matter, the ALJ determined that Claimant met the disability insured status requirements of the Social Security Act on June 27, 2005, the alleged onset date. (Tr. 14). The ALJ then applied the facts, as she found them, to the sequential evaluation framework. At Step One, the ALJ found that Claimant had not engaged in substantial gainful activity since August 11, 2005, the date that she filed her application for disability benefits. (Tr. 16).

*Step Two.* At the second step, the ALJ must determine whether the claimant suffers from a "severe impairment" or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). If the ALJ concludes that none of the claimant's impairments are medically severe, the ALJ will consequently find that the claimant is not disabled; if, however, the ALJ concludes that the claimant's impairments are medically severe, then the ALJ will proceed to the next phase of the analysis. *Id.* Here, the ALJ found that Claimant's lower back and neck pain and degenerative disc disease constituted severe impairments within the meaning of the regulations, but found that Claimant's affective disorder was not severe. (Tr. 16-17).

25

*Step Three.*  The third step requires the ALJ to consider the "medical severity of [the claimant's] impairments" in order to determine whether the claimant's impairment meets or equals those listed in Appendix I of the Regulations.  20 C.F.R. § 404.1520(d).  Although the list is too voluminous to set forth here, the listings help to identify those claimants whose medical impairments are so severe that it is likely that they would be found disabled regardless of their vocational background.  *Bowen v. Yuckert*, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297 (1987).  If the ALJ concludes that the impairments meet or equal one of those listed and meet the duration requirement, the ALJ will find the claimant disabled without considering age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(iii) & (d).  If not, the inquiry will proceed to the next stage.

In this case, the ALJ determined that Claimant did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 17).  Accordingly, to find Claimant disabled, the ALJ needed to proceed to the next step in the analysis.

*Step Four.*  This step requires that the ALJ determine whether the claimant has the "residual functional capacity" to perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The Regulations define "residual functional capacity" ("RFC") as what an individual can still do despite any limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a).  This determination takes into account "all relevant evidence," including the medical evidence, the claimant's own testimony, and the observations of others.  *Id.*  The ALJ must then compare the RFC to the demands of the previous employment to determine whether the claimant is still capable of performing that kind of work.  If so, the ALJ will conclude that the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv) & (f).

Here, the ALJ assessed Claimant's residual functional capacity to perform relevant work, and in doing so considered Claimant's subjective complaints as well as her treating physicians' medical records, the consultative examiners' records, and the Residual Functional Capacity Assessments. In reviewing the evidence, however, the ALJ found that Claimant's subjective complaints were not entirely credible to the extent alleged. (Tr. 19). The ALJ also determined that Claimant's allegations of total disability were not consistent with and were disproportionate to the record as a whole. *Id.*

Based upon her review of the entire record, including treating physician records and opinions of State Agency medical consultants, the ALJ found that Claimant retains the residual functional capacity to perform sedentary work with limitations involving a sit/stand option every 30 minutes, and only occasional bending.[20] (Tr. 17). Therefore, the ALJ determined that Claimant could return to her past relevant work as parking lot cashier or a receptionist. (Tr. 21). In the alternative, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Claimant

---

[20]   "Sedentary work" is defined as work that involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally. 20 C.F.R. § 404.1567(a). The term "occasionally" in the context of sedentary work means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. *Id*.

can perform.[21]  *Id.*  Accordingly, the ALJ concluded that Claimant is not under a "disability," as defined in the Social Security Act.  (Tr. 21-22).

**B.**      **The ALJ's Decision is Supported by Substantial Evidence**

Here, Claimant disputes the findings and conclusions of the ALJ, arguing that the ALJ erred by not finding Claimant's depression to be a severe impairment and, therefore, did not take it into consideration when determining her residual functional capacity.  Claimant also contends that the ALJ erred in discounting Claimant's testimony regarding her subjective complaints of pain and finding Claimant to be not fully credible.  Finally, Claimant contends that the ALJ improperly rejected or failed to consider certain treating physicians' medical opinions.

**1.**      **The ALJ Properly Analyzed Claimant's Mental Impairment**

The first issue that the Court considers is whether the ALJ erred by not considering Claimant's depression to be a "severe" impairment.  Claimant contends that her depression was severe and, thus, the ALJ should have taken it into consideration when determining Claimant's residual functional capacity ("RFC") and her ability to perform her past relevant work.  The record reflects, however, that the ALJ appropriately considered Claimant's depression and found it to be

---

[21]      Had the ALJ found that Claimant could not continue to perform her past relevant work, at Step Five the burden would have shifted to the Commissioner to demonstrate that there exists other substantial gainful employment in the national economy that Claimant can perform. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *Smith v. Schweiker*, 646 F.2d 1075, 1077 (5th Cir. 1981).  If the Commissioner proffers possible alternative employment, the burden returns to a claimant to prove an inability to perform those jobs.  *Id.*  The ALJ must then resolve whether the claimant is actually capable of performing other gainful and substantial work within the economy.  20 C.F.R. § 404.1520(f).  Essentially, the ALJ must determine if there is other work available in significant numbers in the national economy that the claimant has the ability to perform.  If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled.  If the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant is disabled.

"not severe" because it caused no more than "mild" restrictions in activities of daily living.  Had the ALJ deemed Claimant's depression to be a severe impairment, such a finding would have been inconsistent with the psychological evaluations performed on Claimant. Accordingly, the ALJ did not commit error in concluding that Claimant's depression was not a severe impairment.

The crux of Claimant's contention is that the ALJ erred in relying on the opinion of non-examining state agency physicians Drs. Clark and Shapiro, rather than the opinion of the consultative physician, Dr. Bash, who examined Claimant.  The flaw in Claimant's arguments stems from the fact that none of the doctors' opinions (including that of Dr. Bash) support the conclusion that Claimant suffered a severe mental impairment.  Dr. Bash's consultative mental status examination of Claimant revealed that Claimant was oriented in all spheres, was cooperative, and demonstrated good eye contact. (Tr. 298-299).  Claimant also had no speech or language problems, although her affect was angry and tearful.  *Id.*  Claimant indicated that at night, she sometimes had visual and audio hallucinations.  *Id.*  Claimant reported, however, that her medications helped her mood by reducing her stress levels.  *Id.*

Dr. Bash found Claimant's recent and remote memory to be below average, but her fund of information was within functional limits.  *Id*.  According to Dr. Bash, Claimant suffered from depressive disorder.  *Id.*  Dr. Bash, however, never opined that Claimant's mental condition was severe.  The Court notes, as the ALJ did, that Dr. Bash assigned Claimant a GAF score of 57, which is characterized by "moderate symptoms" pursuant to the Diagnostic and Statistical Manual of Mental Disorders. (Tr. 17).  Accordingly, even if the ALJ had adopted Dr. Bash's conclusion with respect to Claimant's GAF score, the score would still not support a finding that Claimant's mental impairment was "severe."  And, as the Commissioner points out in his Response, a GAF score does

not alone determine disability and is, instead, a piece of evidence to be considered within the context of the record as a whole.  *See Petree v. Astrue*, 260 Fed. App'x 33, 2007 WL 4554293 at *8 (10th Cir. Dec. 28, 2007).  Additionally, GAF scores are not endorsed for use in disability proceedings because they have no "direct correlation to the severity requirements of the mental disorders listings."  *See* 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (Aug. 21, 2000); *Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002) (GAF score is not essential to RFC accuracy). Significantly, Dr. Bash never expressly opined that Claimant's mental impairment was "severe."

Looking to Claimant's medical record as a whole does not assist in her argument that the ALJ erred in failing to find her mental impairment not severe.  Indeed, both non-examining state agency mental health experts opined that Claimant's affective disorder was not severe, as it caused no more than mild restrictions in activities of daily living and maintaining social functioning and maintaining concentration.  (Tr. 255, 206).  Both doctors also diagnosed Claimant with depression that was "not severe."  *Id.*  The ALJ cited to and relied on both Dr. Bash's findings and the state agency mental health experts' opinion in concluding that Claimant's mental impairment was not severe.  (Tr. 17). The ALJ concluded that Claimant's alleged deficits in concentration produced no more than "mild limitations."  (Tr. 16).

The ALJ's findings are further bolstered by notations made by Dr. Halim in his treatment notes.  During Dr. Halim's neurological evaluation of Claimant, he noted that Claimant was awake, alert, and oriented to time, place, and person.  (Tr. 166, 219).  He also found Claimant's language and comprehension to be normal, and her long- and short-term memories to be intact.  *Id.*  Also significant is the lack of treatment notes relating to Claimant's alleged mental impairment in the medical record.  Indeed, conspicuously absent from the record are any treatment notes for depression

or any other mental health impairment.  Other than the medical records of state consulting physician Dr Bash, the record is devoid of any psychiatric treatment notes.  While it appears that Claimant was taking Prozac during certain periods of time, it is unclear who prescribed the medication or why. It also appears that Claimant did not seek any mental health counseling, as the record does not contain any such records.  Additionally, Claimant was not hospitalized for any mental health condition, nor does the record reflect that she sought any therapy.  All of these facts support the ALJ's finding that Claimant did not suffer from a severe metal impairment.  *See Watson v. Heckler*, 738 F.2d 1169, 1173 (11th Cir. 1984) (ALJ may consider a claimant's failure to seek treatment). Likewise, the fact that Claimant conceded that medications helped her with her depression supports the ALJ's finding of a non-disabling condition.  *See Dawkins v. Bowen,* 848 F.2d 1211, 1213 (11th Cir. 1988).

Further, Claimant's allegation that the ALJ erred by not considering Claimant's mental impairments in combination with her other impairments is not supported by the record.  Claimant suggests that "[a] disability claimant should be evaluated as a whole person, and not evaluated in the abstract as having several hypothetical and isolated illnesses." D.E. 20 at p. 14.  The ALJ's opinion, however, indicates that she did evaluate Claimant's impairments exactly in the manner that Claimant suggests she should have.  The ALJ made the explicit finding that "Claimant does not have an impairment *or combination* of impairments that meets or medically equals one of the listed impairments . . . ." (Emphasis added).  The ALJ went on to conclude, after "careful consideration of *the entire record*," she did not find Claimant to be disabled.  (Tr. 17).  In making this finding, the ALJ stated that she "considered *all symptoms* and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  (Tr. 17).  It is

31

clear that the ALJ considered all of Claimant's impairments in combination and, therefore, the ALJ properly analyzed Claimant's mental impairment both individually and together with her other impairments.

Finally, Claimant alleges that the hypothetical questions posed to the vocational expert by the ALJ during the administrative hearing did not include limitations related to Claimant's mental impairment. The Court agrees with the Commissioner that the hypothetical questions presented to the vocational expert properly included all credible limitations. Even assuming, *arguendo*, a vocational expert was required to attend the hearing, the ALJ posed appropriate questions to her. Based upon the entire record, including all of the medical records presented by Claimant, the ALJ determined that Claimant's mental impairment was not severe. Accordingly, the ALJ did not need to include any mental limitations in the hypothetical questions posed to the vocational expert.

Moreover, if Claimant had objections to the way in which the ALJ formulated her hypothetical questions, Claimant had every opportunity to direct questions toward the vocational expert. Indeed, Claimant's counsel did, in fact, make certain inquiries with respect to how Claimant's alleged mental impairment would affect her ability to work. (Tr. 335-338). Specifically, counsel asked the vocational expert whether Claimant's inability "to concentrate on something for more than 30 minutes" would affect her ability to work as a receptionist or a cashier. (Tr. 336). The vocational expert responded that it would affect the receptionist job, but would have no effect on the parking lot cashier position. (Tr. 336). Hence, the vocational expert's testimony supports the conclusion that a finding of disabled would not be warranted even when considering Claimant's alleged mental impairments.

Ultimately, the ALJ properly analyzed Claimant's mental impairment and found it to be not severe.  The record supports this finding and, accordingly, the ALJ did not commit reversible error.

### 2.   The ALJ Properly Considered Claimant's Credibility.

Next, the Court addresses the argument that the ALJ erred by finding that Claimant's subjective complaints concerning her impairments and the extent of their impact on her ability to do any work activities at all, were not entirely credible.  In evaluating a claimant's subjective complaints, an ALJ must apply the principle that "pain testimony should be consistent with the degree of pain that could be reasonably expected from a determinable medical abnormality." *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991).  In furtherance of conducting such an analysis, an ALJ must apply a three-part pain standard when a claimant attempts to establish disability through pain or other subjective symptoms.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  This standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) evidence that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  *Id.* (citations omitted).  Thus, a claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability.  *See id.* at 1561.  Other possible factors for consideration include the levels of medication and their effectiveness on the Claimant, the extensiveness of the attempts to obtain relief, the frequency of medical contacts, and the nature of daily activities.  *Hargis*, 945 F.2d at 1489; *see also* 20 C.F.R §§ 404.1529 and 416.929.

The ALJ did not conclude that Claimant's complaints of pain were invalid.  Indeed, the ALJ recognized that "the claimant's medically determinable impairments could reasonably be expected

to produce the alleged symptoms." (Tr. 19). She found, however, that in light of all of the other record evidence, "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." *Id.* In this regard, the ALJ concluded that although medical evidence did support the presence of some limitations, it did not provide a basis for finding the presence of disabling limitations as of the date of last insured.

If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility. *Walker v. Bowen*, 826 F.2d 996, 1004 (11th Cir. 1987). The ALJ should also determine whether there are inconsistencies in the evidence and whether there are conflicts between claimant's statements and the record as a whole. *See* 20 C.F.R. § 416.929(c)(4). Here, the ALJ expressed the reasons for her discrediting of Claimant's testimony on pain, and the ALJ's analysis encompassed the requirements of the Eleventh Circuit pain standard. It is important to note that a finding of disability requires more than the mere inability to work without pain. Rather, the relevant question is whether a claimant is credible to the extent that the described pain prevents her from performing substantial gainful activity. *See Clark v. Chater*, 75 F.3d 414, 417 (8th Cir. 1996).

When considering Claimant's subjective complaints, the ALJ highlighted discrepancies between Claimant's testimony and the information contained in documentary reports, reports in the record, the findings made on examination, and the totality of the evidence in the case. (Tr. 17-21). The ALJ concluded from the medical evidence that Claimant did experience lower back and neck pain and degenerative disc disease with herniated nucleus pulposus at L-4-5, L5-S1. (Tr. 16). Thus, the ALJ did determine that the record supported a finding that the first prong of the pain standard

had been met.  The ALJ, however, found that Claimant's condition did not meet the requirements of either of the last two prongs of the pain test.

The ALJ considered Claimant's testimony, objective medical evidence, activities, work history, and treatment measures.  (Tr. 16-22).  Despite Claimant's allegations of severe pain, substantial evidence supports the conclusion that her medical condition was not of such a severity that it could reasonably be expected to give rise to the alleged disabling pain.  Indeed, the ALJ documented in her opinion the various aspects of the record that led her to that conclusion.  (Tr. 19-21).

In this regard, the ALJ highlighted Claimant's consultative examination on December 13, 2005, with Dr. Marcus, who found that Claimant was able to ambulate without assistance, although she could not perform a heel/toe walk.  (Tr. 19).  Dr. Marcus also stated that Claimant showed nearly a full range of motion and that an examination of her major joints showed no evidence of deformity, pain, swelling, heat, redness, tenderness, or any sign of inflammation except in the left leg.  *Id.*  Dr. Marcus's examination revealed only "mild" muscle spasm in the lumbar spine.  *Id.*

Claimant contends the ALJ erroneously relied upon the results of Dr. Marcus's examination because they were prior to Claimant's March, 2007, injury.  Thus, Claimant contends that the ALJ did not take into account a later MRI performed on her lumbar spine, which revealed herniated discs at the L4-5 and L5-S1 levels.  This assertion does not render the ALJ's analysis erroneous.  First, it is apparent from the ALJ's decision that she took into account the MRI that was performed after Claimant's visit with Dr. Marcus.  Indeed, the ALJ found that Claimant suffered from the very impairments that the MRI revealed.  Second, the fact that Dr. Marcus examined Claimant prior to her second injury does not render his opinion devoid of merit.  Instead, the ALJ is still justified in

35

utilizing Dr. Marcus's evaluation to consider Claimant's credibility before her second injury.  In this regard, the evaluation may reasonably be found to reveal certain inconsistencies between Claimant's complaints and her physical condition before the March, 2007, injury.  And this credibility determination could carry over to the subsequent time frame.

Additional record evidence also supports the ALJ's finding that Claimant's complaints of pain were not entirely credible.  For example, as noted by the ALJ, state agency reviewing experts opined that, from a physical standpoint, Claimant was capable of performing work at the light exertional level.  (Tr. 19).  In this regard, Dr. Andriole and the other state medical consultant found on two separate occasions that Claimant could occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry 10 pounds.  (Tr. 211, 238).  The doctors further concluded that Claimant could stand and/or walk for approximately 6 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday.  *Id.*  Claimant's ability to push and pull, in both doctors' opinions, was unlimited, other than as shown for lifting and/or carrying.  *Id.*  The doctors cited specific facts in Claimant's medical records such as the results of an MRI performed, as well as other physical examinations, to support these conclusions.  *Id.*  Dr. Andiole also opined that Claimant had no postural manipulative, visual, communicative, or environmental limitations.  (Tr. 212-215).  The RFC reflects that Dr. Andiole found Claimant to be only partially credible.  (Tr. 215).

Other medical evidence reveals that when Claimant underwent a nerve conduction study, Dr. Halim found that the results showed no evidence of lumbar radiculopathy and no more than mild weakness involving the right foot dorsiflexion and eversion and mild decreased sensation in the right L-5/S-1 distribution.  (Tr. 21).  Moreover, in May of 2007 and June of 2007, Dr. Kugler found that Claimant had only mild tenderness to palpation of the cervical spine and was neurologically intact.

36

(Tr. 178).  Additionally, Dr. Kugler noted that Claimant had no significant instability, and had a 4+/5 motor function.  *Id.*  Dr. Burack's notes also reflect that Claimant had only mild neck pain, which he felt was improving.  (Tr. 181).

The conservative nature of Claimant's treatment also serves as support for the ALJ's discrediting of Claimant's subjective complaints of pain.  *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (allegations of disabling pain are properly discounted where the record evidences inconsistencies such as conservative medical treatment).  When Dr. Marcus examined Claimant, he recommended that Claimant use hot packs, ultrasound and electrical stimulation.  (Tr. 195).  He also indicated that physical therapy with gait strengthening would be helpful to Claimant.  *Id.*  Further, Dr. Marcus recommended an extensive weight loss program with dietary counseling.  *Id.*  Likewise, the ALJ considered the treatment notes of March 2007 from Dr. Halim, who opined that Claimant was not a surgical candidate.  (Tr. 20).  Neither Dr. Nair nor Dr. Brodner recommended surgery for Claimant's lumbar disc disease and, instead, advised Claimant to lose weight and continue with her conservative medical treatment.  (Tr. 160).  Dr. Halim also suggested that weight loss would help Claimant improve her back pain.  (Tr. 20).

Upon examination, Dr. Kugler recommended that Claimant undergo physical therapy.  (Tr. 178).  However, Claimant reportedly denied any interest in physical therapy or pain management. (Tr. 20).  Although Drs. Halim and Kugler recommended epidural injections in the lumbar spine if Claimant's pain became intolerable, Claimant did not seek the injections.  (Tr. 158, 171).  Likewise, in May of 2007, when Dr. Kugler referred Claimant for a cervical epidural injection, he later reported that Claimant had elected not to proceed with the injection.  (Tr. 171).  Instead, Claimant preferred to continue with conservative treatment.  *Id.*  In the ALJ's view, the totality of the evidence

suggested that Claimant was not as limited by her pain as she had alleged. *See Hargis*, 945 F.2d at 1489 (court may consider the levels of medication and their effectiveness on the Claimant as well as the extensiveness of the attempts to obtain relief); *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (refusal to follow prescribed treatment without good reason will preclude a finding of disability); *see also* 20 CFR §§ 404.1529 and 416.929.

Despite these findings, Claimant challenges various reasons that the ALJ provided for discounting Claimant's credibility regarding the severity of her pain. First, Claimant states that the ALJ incorrectly reported that Claimant testified that she lifted 300 to 400 pounds as a transport driver (Tr. 18) and alleges that she testified that the most she was required to lift was 80 to 100 pounds. (Tr. 308). A review of the transcript from the administrative hearing indicates that Claimant testified that she lifted anywhere between 350 and 400 pounds as a transport driver. (Tr. 307- 308). However, when the ALJ later sought clarification from Claimant, she testified that she actually lifted anywhere between 80 and 100 pounds. (Tr. 308). While the ALJ's citation to this fact could be seen as an "error," it does not appear from the opinion that the ALJ used Claimant's testimony on this issue to discount her credibility in any way. Furthermore, Claimant does not suggest how this finding may have been improperly used by the ALJ to undermine her credibility. Accordingly, the alleged error concerning what Claimant could or could not lift did not affect the ALJ's credibility determination in any way and, thus, is not a basis to remand the case.

Next, Claimant contends that the ALJ referenced Claimant's visit to St. Mary's Hospital as "some kind of proof that because she did not complain about back pain, [] she is exaggerating her symptoms." DE 20 at p. 16. Claimant contends that she went to the hospital seeking treatment for one specific and immediate problem (not involving her back), and that her failure to report back pain

38

at that time should not discount her credibility.  The Court agrees with the ALJ, however, that the timing and results of the St. Mary's visit provided the ALJ with a reason to question the severity of Claimant's back pain.

As the ALJ noted, during Claimant's visit to the emergency room on June 28, 2005, Claimant was diagnosed with pelvic inflammatory disease and complained of pelvic, not back pain.  (Tr. 19). Because Claimant reported the onset of her back pain only one day before this visit to the hospital, it was inconsistent for Claimant to fail to report any lower back pain.  The fact that Claimant was in no acute distress when she presented to the emergency room refutes Claimant's allegations of disabling lower back pain. As the Commissioner noted, the emergency room provider indicated that Claimant walked "frequently" and had no limitations with respect to her mobility. (Tr. 289). Additionally, on examination, Claimant's neck and back were both found to be normal.  (Tr. 287). Even taking into account Claimant's contention that she went to the hospital to treat a distinct problem, it is difficult to comprehend why Claimant's mobility and back examination would be deemed normal if she were already suffering from disabling back pain.  With all of the circumstances considered, it was not unreasonable for the ALJ to discount Claimant's testimony and credibility.

Finally, Claimant testified during the administrative hearing that she applied for unemployment benefits after her alleged disability onset date. (Tr. 325-26).  As noted by the Commissioner, a claimant who applies for unemployment compensation benefits holds herself out as available, willing, and able to work. D.E. 24 at p. 17.  Because such an application indicates an ability to work, this testimony further undermines Claimant's credibility and her contention that she suffered from disabling back pain.

Ultimately, the ALJ properly applied the law in evaluating the entire body of evidence in light of inconsistencies between Claimant's assertions and other evidence in the record. Although the ALJ found evidence of an underlying medical condition, she concluded that the objective medical evidence did not confirm the severity of the alleged pain arising from that condition. Because the ALJ articulated adequate reasons for discrediting Claimant's subjective pain testimony and substantial evidence in the record supports this decision, the ALJ's finding cannot be disturbed by this Court.

### 3.      The ALJ's Consideration of Treating Physicians

In her final argument, Claimant asserts that the ALJ erred by failing to take into consideration the medical opinions of Dr. Timothy Toward and Dr. Donna Ducille. According to Claimant, both doctors are treating physicians who also completed forms on behalf of Worker's Compensation and opined that Claimant's condition would not permit her to work. Claimant argues that as treating physicians, these doctors' opinions should have been given substantial or considerable weight unless good cause existed to the contrary. Claimant contends that the ALJ failed to consider, let alone, articulate the reasons for giving less weight to the opinions of these treating physicians. The Commissioner concedes that the ALJ did not refer explicitly to the opinions of Drs. Toward and Ducille, but argues that the doctors were not treating physicians. Additionally, the Commissioner asserts that the doctors merely filled out "checkbox" forms, and, thus, their opinions may be discounted because they were conclusory. Consequently, the Commissioner contends that the ALJ did not err by failing to address Drs. Toward and Ducille's opinions.

### a.    Were Drs. Toward and Ducille Treating Physicians?

In determining whether the ALJ erred by failing to address explicitly the opinions of Drs. Toward and Ducille, the Court must first determine whether the doctors may be deemed to be treating physicians. Pursuant to Social Security regulations, a treating physician is defined as a "medical source who provides [the claimant] or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R §§ 404.1502, 404.1527(d)(2), 416.927(d)(2). On the other hand, a non-treating physician is "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.*

In making the determination of whether a doctor is a "treating source," courts have held that a single examination does not suffice to establish such a relationship, but seeing a claimant at least three times and conducting testing that no other doctor has conducted may qualify the doctor as a treating physician. *See Milner v. Barnhart*, 275 Fed. App'x 947, 948, 2008 WL 1923104, *1 (11th Cir. May 2, 2008) (rejecting doctor as treating source where he saw claimant only on one occasion); *Cronon v. Barnhart*, 244 F. Supp. 2d 1286, 1293 n.21 (N.D. Ala. 2003) (holding that seeing claimant three times and conducting tests that no other doctor conducted qualified doctor as treating source); *see also Poplardo v. Astrue*, 2008 WL 68593, * 10-11 (M.D. Fla. Jan. 4, 2008) (finding that doctor was treating source for claimant where doctor saw claimant in more than four visits and over four months conducted extensive tests). If an ALJ opts not to give controlling weight or substantial weight to a treating physician's opinion, the ALJ must "further assess the value of the opinion in relation to other inconsistent evidence." *Id.*; 20 C.F.R §§ 404.1502, 404.1527(d)(2), 416.927(d)(2).

### (1)     Dr. Toward

While this presents a close case, the record contains sufficient evidence to conclude that Dr. Toward had an ongoing treatment relationship with Claimant that would qualify him as a treating physician.  The medical verification forms that Dr. Toward completed indicate that Claimant visited him at least two times – once on August 8, 2005 (Tr. 189, 190, 192, 265), and again on December 19, 2005.  (Tr. 186).  Additionally, the Disability Report completed by Claimant indicates that Claimant first saw Dr. Toward on July 1, 2005, and further refers to an upcoming appointment scheduled for October 3, 2005.  (Tr. 147).  Although no other records exist  regarding Claimant's visits with Dr. Toward in July and October, the medical records indicating August and December, 2005, visits show that Dr. Toward had, in fact, developed longitudinal medical opinions as to Claimant's medical condition.[22]  Dr. Toward consistently indicated in his records that Claimant suffered from lumbar disc disease, that her condition was permanent, and that he had prescribed ongoing therapy and treatment.

Further evidence in the record supports the conclusion that Dr. Toward was, in fact, a treating physician.  First, in the Disability Report, Claimant indicates that she visited Dr. Toward on July 29, 2005, to have an x-ray performed on her back.  (Tr. 147, 148).  Second, at the time she completed the Disability Report, Claimant reports that she was taking medications both for pain and swelling, which had been prescribed for her by Dr. Toward.[23]  (Tr. 147).  Third, it appears that Dr. Toward

---

[22]     The Court notes that while there are other aspects of Dr. Toward's medical forms that could have led the ALJ to give his medical opinion less than controlling weight, this possibility does not affect the determination of whether Dr. Toward can be deemed a treating physician.

[23]     The Disability Report indicates that Dr. Toward prescribed Claimant Cyclobenzaprine and Hydrocodone for pain, Ibuprophen for pain and swelling, and Indomethacin

referred Claimant to two other specialists for examinations, the results of which were returned to Dr.

Toward for consideration.  Specifically, on December 20, 2005, Claimant visited Dr. Bruce Rodan

to obtain an MRI of her lower back at Mizner Place MRI.  The medical report containing the results

of that test were sent to Dr. Toward.[24]  (Tr. 233-234, 267-268).  Thus, the Court infers that Dr.

Toward referred Claimant for the MRI.  Further, on March 14, 2006, Claimant visited CORA

Rehabilitation Clinics to obtain a lumbar evaluation.  The extensive form that was completed by

CORA's therapist noted that Dr. Toward was the "referring physician" for the patient. (Tr. 235-236).

When each of these facts is considered in conjunction with the fact that the record reflects

that Claimant visited Dr. Toward at least four times, the Court must find that Dr. Toward had a

longitudinal picture of Claimant's impairments as set forth in 20 C.F.R. § § 404.1527(d)(2) and

416.927(d)(2).  As such, sufficient evidence indicates that a treatment relationship existed between

Claimant and Dr. Toward with respect to Claimant's back condition.  The Court, therefore,

concludes that Dr. Toward was a treating physician.

### (2) Dr. Ducille

Next, the Court considers whether Dr. Ducille can be deemed to be a treating physician.  The

Court finds that in light of the evidence contained in the record, it is appropriate to consider Dr.

Ducille a treating source for Claimant.  Indeed, the record indicates that Claimant visited Dr. Ducille

at least five times over the course of approximately one year.  Claimant initially visited Dr. Ducille

on April 25, 2006, at which time the doctor recorded information regarding Claimant's past medical

---

for swelling.  (Tr. 147).

[24]     Dr. Rodan's impression of the MRI was that Claimant suffered from posterolateral
herniated discs at L4-L5 and L5-S1 levels to the left with foraminal encroachment.  He also
noted reactive changes in the facet joints at the L4 and L5 levels.

history as well as the physical examination performed.  (Tr. 224).  During this initial visit, Dr. Ducille made recommendations to Claimant with respect to treatment, health instructions, and preventive care.  *Id.*  When Claimant returned for a second visit on May 23, 2006, Dr. Ducille rendered an opinion that while Claimant was unable to work with restrictions, her condition was temporary and would end in August 2006.  (Tr. 191).  Dr. Ducille was of a similar opinion when Claimant visited her a third time on August 10, 2006, but estimated that Claimant's condition would end in November, 2006.  (Tr. 188).

Thereafter, Dr. Ducille filled out two more medical forms regarding Claimant – one in October of 2006 and another in March of 2007.[25]  (Tr. 187, 193).  Both forms reflect that Dr. Ducille rendered medical opinions with respect to whether Claimant was capable of participating in certain activities.  *Id*.  Although space was provided on both forms for Dr. Ducille to indicate whether she believed that Claimant's condition was temporary or permanent, nothing was indicated on that portion of the form.  While Dr. Ducille opined that Claimant was unable to participate in the various activities listed on the forms, there is nothing that would contradict her previous opinion that Claimant's condition was temporary.

---

[25]     During the hearing, counsel for the Commissioner argued that Dr. Ducille should not be considered a treating physician because she did not have a longitudinal picture of Claimant's condition.  Counsel argued that rather than five visits to Dr. Ducille, Claimant only visited Dr. Ducille twice.  With regard to the forms completed in October, 2006, and March, 2007, the Commissioner asserted that nothing in the forms indicated that Claimant had actually visited Dr. Ducille on those occasions.  When the Court inquired as to why Dr. Ducille would have completed forms if they were not accompanied by a visit from Claimant, counsel responded that he was not in a position to speculate why Dr. Ducille may have taken such a course of action.  The Court finds that without any evidence to the contrary, the more reasonable interpretation of the record is that Claimant visited Dr. Ducille on those dates, thereby constituting her fourth and fifth visits.  Further, the Court finds the contention that Claimant visited Dr. Ducille twice to be unsupported by the record.  At a minimum, the doctor's records specifically identify three distinct dates of examination (April 25, 2006, May 23, 2006, and August 10, 2006).

Based on these medical opinions that were rendered through five visits over the course of nearly a year, the Court finds that Dr. Ducille had a longitudinal picture of Claimant's impairments as set forth in 20 C.F.R. § § 404.1527(d)(2) and 416.927(d)(2).   As such, sufficient evidence indicates that a treatment relationship existed between Claimant and Dr. Ducille with respect to Claimant's back condition.  The Court, therefore, concludes that Dr. Ducille, like Dr. Toward, was a treating physician.

> **b.      Did the ALJ Consider Drs. Toward and Ducille's Opinions, and If Not, Does That Failure Constitute Reversible Error?**

Having found that both Drs. Toward and Ducille are treating physicians, the Court now turns to whether the ALJ considered their opinions and, if not, whether such a failure by the ALJ constitutes reversible error.  Here, it is undisputed that the ALJ did not address, at least explicitly, the opinions of Drs. Toward and Ducille.  Nor did the ALJ did identify the weight she gave, if any, to either of these treating physicians, and she did not state any reasons for not according the doctors' opinions substantial weight.

An ALJ, however, must state the weight accorded to a treating source's opinion and must explain the consideration given to a treating source.  *See* 20 C.F.R. §§ 404.1527, 416.927, 404.1545, 404.1546; Social Security Ruling 96-5p ("Policy Interpretation Ruling Titles II and XVI: Medical Source Opinion on Issues Reserved to the Commissioner") ("the notice of the determination or decision must explain the consideration given to the treating source's opinion(s)."); Social Security Ruling 96-2p ("Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions") ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the

evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight"); *see, e.g., Cook v. Astrue*, 2009 WL 464190, *5 (S.D. Ga. Feb. 24, 2009) (rejecting ALJ's decision for his failure to analyze, evaluate or give weight to treating physician's opinion)*; Letson v. Astrue*, 2009 WL 33536, *5 (N.D. Fla. Jan. 5, 2009) (upholding ALJ's decision to not give controlling weight to treating source's opinion where the ALJ specifically stated the reasons for rejecting the opinion and set forth inconsistences of treating source's opinion with the record); *Austin v. Astrue*, 2008 WL 2385520, *8 (N.D. Fla. June 9, 2008) (remanding ALJ's decision where ALJ rejected treating source's opinion that claimant was disabled, but failed to provide adequate reasons for rejecting the opinion).

Indeed, the Eleventh Circuit has repeatedly held that the opinion of a treating physician must be accorded "substantial or considerable weight unless 'good cause' is shown to the contrary." *See, e.g., Pritchett v. Comm'r of Soc. Sec.*, 315 Fed. App'x 806, 2009 WL 449177, *2 (11th Cir. Feb. 24, 2009); *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)); *Broughton v. Heckler*, 776 F.2d 960, 961-62 (11th Cir. 1985). "Good cause" exists when any of the following three circumstances arise: (1) the opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the opinion was conclusory or inconsistent with the doctor's own medical records.  *Lewis* v. *Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997);  *see also Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

### (1)     Dr. Toward

With these principals in mind, the Court now turns to the question of whether the ALJ's failure to address Dr. Toward's opinions was reversible error.  After review of the record, relevant

case law, and Social Security regulations, the Court finds that the ALJ was required to state specifically the weight given to Dr. Toward's opinion as a treating physician, as well as the reasons for according such weight.  Here, the ALJ neither expressly stated that she discounted Dr. Toward's opinion, nor did she describe what weight, if any, she gave to his opinion.  The ALJ similarly failed to identify the reasons why she accorded less than substantial weight to Dr. Toward's opinion. Under controlling Eleventh Circuit precedent, these errors require that the present case be remanded to the Commissioner.

In the case of a treating physician such as Dr. Toward, an ALJ is required to make explicit the weight given to the treating doctor's opinion and, where not valued substantially, the specific reasons why that opinion was accorded less than substantial weight.  *See* 20 C.F.R. §§ 404.1527, 416.927, 404.1545, 404.1546; SSR 96-5p, 96-2p; *Newton v. Astrue*, 297 Fed. App'x. 880, 884 (11th Cir. 2008) (rejecting ALJ's decision in part where ALJ did not "discredit specifically" treating doctor's conclusions); *MacGregor v. Bowen*, 786 F.2d 1050, 1053-54 (11th Cir. 1986) ("The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."); *Venette v. Apfel*, 14 F. Supp. 2d 1307 (S.D. Fla. 1998) (rejecting ALJ's decision in part where ALJ specifically rejected treating physician's opinion but did not delineate reasons for doing so); *see, e.g., Sharfarz v. Bowen,* 825 F.2d 278, 279 (11th Cir. 1987) ("In assessing the medical evidence in this case, the ALJ was required to state with particularity the weight he gave the different medical opinions and the reasons therefor."); *Wallace v. Barnhart*, 256 F. Supp. 2d 1360, 1370-71 (S.D. Fla. 2003) ("The ALJ must specify what weight is given to a treating physician's opinion and must specify any reasons for giving it no weight.").

47

In the present case, the ALJ found that Claimant was not disabled and that she had the residual functional capacity to perform sedentary work with restrictions. (Tr. 21). The ALJ's opinion is contrary to Dr. Toward's most recent written medical opinion dated December 19, 2005, wherein Dr. Toward opined that Claimant's condition is permanent and that her medical condition does not permit work with restrictions. (Tr. 186). The ALJ, however, neither addressed Dr. Toward's opinion nor identified the weight she afforded to it. As such, it is unclear whether the ALJ considered Dr. Toward's opinion in concluding that Claimant is not disabled. Even if one could construe the absence of the ALJ's discussion of Dr. Toward's opinion in her decision to reflect that the ALJ rejected Dr. Toward's opinion, this is insufficient. The ALJ was required to make clear in her opinion that she had discounted Dr. Toward's opinion and the reasons why she afforded it little or no weight.

Without these findings, it is impossible for the Court to determine whether the ALJ gave the physician's opinion sufficient consideration. *See Wiggins v. Schweiker*, 679 F.2d 1387, 1389-90 (11th Cir. 1982) (holding that ALJ's failure to specify weight given to treating doctor's opinion was reversible error where it was impossible to ascertain whether ALJ applied correct legal standards in its review); *Hudson v. Heckler,* 755 F.2d 781, 786 (11th Cir. 1985) (impossible to undertake judicial review where ALJ does not make thought process known); *Cook v. Astrue*, 2009 WL 464190, *5 (S.D. Ga., Feb. 24, 2009) ("[T]he Court is unable to perform meaningful judicial review because the ALJ simply did not make her thought process known in her decision"). And, had the ALJ accorded Dr. Toward's opinions controlling weight, this fact could have changed the outcome of the ALJ's decision.

In the absence in the ALJ's decision of any statement specifying the weight accorded to Dr. Toward's opinion as a treating source and in view of the similar lack of any statement explaining why the ALJ accorded Dr. Toward's opinion less than substantial weight, the case must be remanded to the Commissioner for further proceedings.  *See Wiggins*, 679 F.2d at 1389-90; *Hudson*, 755 F.2d 781 at 786; *Cook*, 2009 WL 464190 at *5; *Lewis*, 125 F.3d at 1439; *see also Sharfarz v. Bowen,* 825 F.2d 278, 279 (11th Cir.1987) (remanding case in part where ALJ disregarded rules about appropriate weight to accord treating sources and non-examining consultative doctors); *Cook*, 2009 WL 464190 at *5 (remanding case where ALJ failed to analyze, evaluate, or give weight to treating physician's opinion regarding claimant's residual functional capacity); Social Security Rulings 96-5p, 96-2p; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (When applying factors to a treating physician's opinion that is not given controlling weight, "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Accordingly, upon remand, the ALJ must state the weight accorded to Dr. Toward's opinion that Claimant's condition is permanent, that the condition does not permit work with restrictions, and that Claimant is unable to work.

### (2)    Dr. Ducille

Similarly, Claimant contends that the ALJ's failure to identify the weight given to the medical opinions of Dr. Ducille constitutes reversible error.  While the Court agrees that Dr. Ducille is a treating physician and notes that the ALJ erred when she failed to identify the weight she accorded Dr. Ducille's opinions, for the reasons expressed herein, the Court finds that this omission does not constitute reversible error.  In this instance, even if the ALJ had explicitly accorded Dr.

Ducille's opinions controlling weight, this fact could not have changed the outcome of the ALJ's decision.  Accordingly, the ALJ's omission constituted harmless error.

As noted above, the testimony or opinion of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary.  *Lewis*, 125 F.3d at 1440.  However, the failure to accord such weight expressly or to articulate the reasons for giving less weight to the opinion of a treating physician does not always constitute reversible error.  The Eleventh Circuit has held that "when an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision will stand."  *Wright v. Barnhart*, 153 Fed. App'x. 678, 684 (11th Cir. 2005); *see Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983).  Accordingly, harmless error exists "when the ALJ failed to discuss a treating physician's opinion, but even giving controlling weight to the opinion would not have changed the outcome."  *Rodgers v. Astrue*, 2009 WL 513757, *4 (M.D. Fla. Mar. 2, 2009) (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (finding that no principle of administrative law or common sense requires remand in quest of a perfect opinion unless there is reason to believe the remand might lead to a different result) and *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 656 (1st Cir. 2000) (holding that while an error of law by the ALJ may necessitate a remand, a remand is not essential if it will amount to no more than an empty exercise)).

In the present case, the Court finds that the ALJ's failure to discuss the weight accorded to Dr. Ducille's medical opinions was harmless error because those opinions are consistent with the ALJ's ultimate findings.  Indeed, the ALJ reached the conclusion that Claimant did not suffer from a disability, which is consistent with Dr. Ducille's opinion that Claimant's condition was temporary and was not expected to last for more than twelve months.  The Court recognizes that Dr. Ducille

originally opined that Claimant's condition would end in August of 2006, and later pushed that date back to November of 2006. While this fact could arguably indicate that Dr. Ducille became less certain about the temporary nature of Claimant's condition, nothing in any of the medical forms filled out after November of 2006 by Dr. Ducille evidences that she had changed her medical opinion. Additionally, although the forms dated October of 2006 and March of 2007 offered a space for Dr. Ducille to set forth whether she believed Claimant's condition to be permanent or temporary, Dr. Ducille never indicated her opinion. Hence, nothing in the medical record suggests that Dr. Ducille had changed her opinion regarding the temporary nature of Claimant's condition.

Accordingly, the Court finds that the ALJ's determination that Claimant was not disabled was consistent with Dr. Ducille's opinion. As a result, the ALJ's failure to state the weight accorded to Dr. Ducille as a treating physician was harmless error because giving controlling weight to that opinion would not have changed the outcome of this case.[26]

---

[26]   Because the Court finds that Dr. Ducille's opinion, even if given substantial weight by the ALJ, could not represent a basis of a finding of disability, it does not present a grounds for remand. Nevertheless, since the case is remanded for further proceedings, should the ALJ wish to also clarify the weight afforded to Dr. Ducille's opinion, she may do so.

## VI.   CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion for Summary Judgment [D.E. 20] should be granted in part, Defendant's Motion for Summary Judgment [D.E. 24] should be denied, and the Commissioner's decision should be remanded to the Administrative Law Judge for findings consistent with this opinion.

**DONE AND ORDERED** in Fort Lauderdale Florida, this 13th day of October, 2009.

_____
ROBIN S. ROSENBAUM
United States Magistrate Judge

cc:      counsel of record

52